[Crim. No. 21751. First Dist., Div. One. Dec. 15, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
GRAFTON RUDOLPH HUDSON, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and David R. Lipson, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RAGAN, J.*—Grafton Rudolph Hudson appeals from a judgment of imprisonment which was rendered after a jury found him guilty of violating Penal Code sections 220 (assault with intent to commit rape), 236-237 (false imprisonment, two counts), 261, subdivisions (2) and (3) (forcible rape), and 288a, subdivision (c) (forcible oral copulation).

*Assigned by the Chairperson of the Judicial Council.

## Facts

Three separate incidents, involving three different women over a period of almost two years, were joined into one information for trial. Following is a brief summary of the facts.

Appellant met Phyllis on four separate occasions to discuss problems their respective children were having at school. The last meeting ended up in her apartment where he physically attacked her, knocked her down, ripped at her clothes, placed his "hand" (*sic*) in her vagina, and threatened to kill her if she did not stop screaming. She kicked him in the groin, grabbed a kitchen knife and ordered him out. She then called the police. Appellant denied being with Phyllis on that occasion. The jury found him guilty of violating Penal Code sections 220 and 236-237.

Nine months earlier, Kathleen met appellant in a bar, drank with him and his friends and after closing time, talked to him in the parking lot for a couple of hours. He eventually pushed her into her car and drove around for a while. He told her to orally copulate him while he was driving and she complied because she was afraid. He later parked the car and engaged in sexual intercourse with her, against her will. The jury found him guilty of violating Penal Code sections 261, subdivisions (2) and (3), 236-237, and 288a, subdivision (c).

One year earlier appellant allegedly raped Teresa and forced her to orally copulate him. A directed verdict of acquittal was entered on these charges.

### I.

## Prejudicial Prosecutorial Misconduct

In the instant case, Mr. Nudelman, the deputy district attorney, resorted to inflammatory rhetoric, violated the trial court's rulings, brought out inadmissible matters in the guise of questions and statements, used extremely vulgar forms of argumentative questions and injected prejudicial innuendo by his editorial comments in front of the jury. Following are a few examples of this.

On cross-examination of appellant:

"Q. Did you tell her how much she was going to love it?

"A. I don't know. I could have.

"Q. Did you tell her that yours was the greatest in the world? That it was going to be heaven for her? What did you tell her? What kind of persuasion?

"A. I don't—I don't know. I couldn't tell you exactly what I said to her 'cause I don't remember what I said.

"Q. Now, anyway, somehow through this persuasion, you're able to overcome her hesitance; is that right?

"A. She overcame—from my observation, overcame her own.

"Q. You're wearing pants with a zipper?

"A. Yes.

"Q. And she unzipped those pants?

"A. That's correct.

"Q. And she reaches into your trousers, right?

"A. You know, as far as details, now, this was a year ago, you know—

"Q. Well, hold it.

"A. Pants been up and down since a year ago.

"Q. Would it be fair to assume that somewhere in your trousers, there is a penis?

"A. You could assume that.

"Q. And somehow before oral copulation is going to take place, that if the pants are going to remain on, the penis is going to have to come out of the trousers?

"A. That's true.

"Q. So, somehow that penis came out of those trousers; is that right?

"A. That's right.

"Q. Now, why don't you tell us how they got out, or how it got out? I presume there's only one? How did it get out? That little bugger just pop out?

"THE COURT: Mr. Nudelman, Mr. Nudelman.

"MR. NUDELMAN: I'm sorry. I apologize to the Court. I sincerely do.

"THE COURT: Let's get through this, all right?"

After establishing that oral copulation was going on, Mr. Nudelman asked appellant, "Is that the way a gentleman acts?"

Another example of unprofessional editorial comment by the prosecutor occurred when he was questioning appellant about having sexual intercourse in the back seat of the car.

"Q. And you had sex where?

"A. In the car.

"Q. Front seat or back seat?

"A. I imagine back seat.

"Q. Did you get out of the vehicle?

"A. No, I don't remember ever getting out of the vehicle.

"Q. Wouldn't it have been easier to just open the doors and get around if you are going to get to the back seat?

"A. I guess it would have been.

"Q. You're a pretty big man, aren't you?

"A. Yes, but pretty agile, too.

"Q. Still pretty awkward, climbing over the front seat to get to the back?

"A. I've done it before.

"Q. I'll take your word for that. Now, when you got to the—

"MR. SCHROEDER [Defense Counsel]: Your Honor, I'd ask that comment be stricken on the part of the district attorney and the jury be admonished to ignore it.

"THE COURT: Well, I don't see any point to it. The comment will be stricken. The jury is instructed to ignore it."

Following is the conclusion of defense counsel's cross-examination of the alleged victim, Kathleen, and another example of the prosecutor's gross misconduct.

"Q. [By Defense Counsel]: Do you remember giving Mr. Hudson your telephone number?

"A. Uh-huh.

"Q. Do you remember Mr. Hudson called you the next day?

"A. I didn't talk to him, but my mother said he called.

"Q. You were aware that he had called your residence?

"A. Well, she told me, yes.

"MR. SCHROEDER: I have no other questions.

"THE COURT: Mr. Nudelman.

"RE-DIRECT EXAMINATION

"Q. MR. NUDELMAN: What else did she tell you?

"MR. SCHROEDER: Objection, calls for hearsay.

"MR. NUDELMAN: *Counsel opened it up. I think we should get in what was said about Mr. Hudson's confession.*

"MR. SCHROEDER: I'm objecting.

"THE COURT: The objection is sustained, Counsel.

"MR. SCHROEDER: I'd ask the jury be admonished in light of Mr. Nudelman's continued comments.

"THE COURT: No continued comments. The jury, I think, understands that I have sustained an objection to the question.

"THE COURT: Ladies and gentlemen, with regard to the last exchange, the Court has sustained an objection as to anything the mother said on the grounds that it's hearsay and is not before you. So, please disregard anything that might have been referred to as to what the mother said or didn't say." (Italics added.)

Attempting to improperly attack appellant's character, Mr. Nudelman asked him, "Basically, your wife threw you out because she was concerned about sexual assaultive, a pattern that you had been manifesting?" for which an objection was properly sustained.

With repetitive questioning the prosecutor overly emphasized that appellant spent much time at Winchell's Donut Shop, a rather immaterial point. He then asked appellant, "That's not too far from where most of the prostitutes hang out?" to which an objection was properly sustained.

Vulgarity is no stranger to Mr. Nudelman's repertoire. On cross-examination of appellant, the prosecutor brought out the details of the act of oral copulation being committed while appellant was driving the car. He then asked:

"Q. So, you were on this road, and once again Miss Brown isn't directing you where to go?

"A. Not at this point.

"Q. She's not saying anything.

"A. No, not at this point.

"Q. You could say her mouth was full?" An objection was properly sustained.

One more example of the prosecutor's overly zealous approach related to the circumstances of appellant's arrest. Appellant testified he responded to a request from the police to go to the station to discuss the case relating to Teresa. The prosecutor questioned appellant, "[I]n fact, you were brought down to be interrogated on another case?" The judge discussed the matter at length with both counsel outside the presence of the jury, and directed the deputy district attorney to indicate in his cross-examination that it was a misdemeanor offense on which appellant was interrogated. Defense counsel requested of the trial court that the prosecutor be instructed not to mention the nature of the misdemeanor which was indecent exposure on a matter completely unrelated to the present case. The potential of prejudice was clearly brought out in a lengthy 20-minute exchange between the court and counsel. The prosecutor then repeatedly cross-examined appellant about another case involving a Debbie Wysaki, bringing out that he was arrested for another offense involving a woman as the victim. The fact that it was a misdemeanor was never mentioned to the jury. Further there appears to be no necessity for the prosecutor to have referred to the unrelated case as having a woman victim.

In closing argument the prosecutor emphasized and compounded this error by the statement: "And just by coincidence, at just the same time, the defendant is down at the police station, but not having come down voluntarily, having been brought down by police officers under arrest because of an offense that relates to another woman? What a curious coincidence that is. [¶] It's not that Grafton Hudson is lying about being at the San Jose Police Department. It's just that he gets his victims confused, and he can't remember how he gets there."

Further, the deputy district attorney appealed to the jury: "And I tell you I want him off the streets for as long as I can get him off the streets, and I'm going to bring as many people as I can to get him off the streets as long as I can, because, ladies and gentlemen, his guilt is beyond a reasonable doubt. [¶] I would ask you, as the ultimate arbiters on social conduct in this community, to find the conduct of the defendant as offensive as it is and to find it a violation of the law as it is. I

would ask you to do your duty, to follow your duty, and if you do that, you do justice. I'm going to require that you find Grafton Hudson guilty as charged of all the offenses. [¶] Thank you.... [¶] But there are times when you say enough is enough is enough. You got to get him off the streets and you get him off the streets as long as you can, because my job is to protect the people of the State of California."

In closing argument, the prosecutor paraphrased reasonable doubt as, "Proof beyond a reasonable doubt is that state of the case when twelve unprejudiced minds are convinced of the truth of the charge. That's what it is without all the legal gobble-di-gook attendant upon the definition."

It is conceivable that any one of the described tactics of the prosecutor, although error, might be accidental and harmless. When all of them are combined, there is no doubt that appellant was deprived of his right to a fair trial guaranteed to him by the due process clauses of the United States and California Constitutions. (See *People* v. *Rodgers* (1979) 90 Cal.App.3d 368, 372 [153 Cal.Rptr. 382], and citations contained therein.)

The question of appellant's guilt depended greatly on the jury's determination of the relative credibility of witnesses. The evidence is in sharp conflict. In regard to the alleged incident involving Phyllis, appellant testified he was not present on that occasion, and that earlier they had an argument over their respective children. Regarding the incident involving Kathleen, appellant testified the sexual acts were consensual. The highly prejudicial implications arising from the improper questions asked of appellant on cross-examination impaired his credibility and presented him as a person of criminal tendencies. (See *People* v. *Wagner* (1975) 13 Cal.3d 612 [119 Cal.Rptr. 457, 532 P.2d 105].)

The challenged remarks of the prosecutor went far beyond the scope of legitimate argument. The challenged questions were argumentative and were designed to prejudice the jury against appellant. "The prosecuting attorney may well be assumed to be a [person] of fair standing before the jury, and the members thereof may well have thought that he could prove the innuendo contained in the improper questions and the claims he made in his argument concerning the characteristics of the defendant." (*People* v. *Duvernay* (1941) 43 Cal.App.2d 823, 828 [111 P.2d 659].)

On some occasions of misconduct, the trial judge sustained objections and mildly admonished the jury. At other times, no objection was made. We agree with appellant's contention that comments by the prosecutor were so damaging that timely objections and admonitions would not have cured the harm, especially such mild admonitions as were given by the trial judge. (See *People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal. Rptr. 1, 609 P.2d 468].)

"Fewer judgments would have to be reversed if the trial courts were more firm in controlling the comparatively few prosecutors who need restraint." (*People v. Ford* (1948) 89 Cal.App.2d 467, 472 [200 P.2d 867].) For a suggested admonition, see *People v. Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].

Recommended reading for overly zealous prosecutors includes the following cases: *People v. McGreen* (1980) 107 Cal.App.3d 504 [166 Cal.Rptr. 360] (insinuation that a defense expert was a perjurer); *People v. Wagner, supra*, 13 Cal.3d 612, 621 (impermissible character impeachment); *People v. Wells* (1893) 100 Cal. 459, 463 [34 P. 1078]; *People v. Duvernay, supra*, 43 Cal.App.2d 823, 828 (excellent discourse on the impact of improper impeachment and argument); *In re Rodriguez* (1981) 119 Cal.App.3d 457 [174 Cal.Rptr. 67] (inflammatory rhetoric in a rape case.)

II.

*Reversible Instructional Error in Failing to Give Sua Sponte CALJIC No. 2.70 Regarding Admissions and Confessions*

Kathleen's mother testified as a rebuttal witness that the appellant telephoned in the afternoon shortly after the alleged offense. He said, "I am sorry. I am guilty, I am guilty, I am guilty."

Obviously this was an oral admission of a very damaging nature, and CALJIC No. 2.70 should have been given *sua sponte*, which it was not. (*People v. Ford* (1964) 60 Cal.2d 772, 799 [36 Cal.Rptr. 620, 388 P.2d 892]; *People v. Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1].)

■ Upon reweighing the evidence and examination of the entire case, it is reasonably probable that a more favorable result would have been reached had the prosecutor not resorted to such prejudicial tactics,

and had CALJIC No. 2.70 been given. We are of the opinion that the error complained of has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].) When we apply the standard enunciated in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065], to the violation of appellant's right to a fair trial guaranteed to him under the Fourteenth Amendment to the United States Constitution, we find that respondent has not proved beyond a reasonable doubt the error complained of did not contribute to the verdicts obtained.

Judgment is reversed.

Elkington, Acting P. J., and Grodin, J., concurred.